

# United States v. State of Mississippi
# Civil Action No.: 3:03-cv-1354-HTW-FKB

21st Monitor's Report
Oakley Training School

Kelly Dedel, Ph.D.
One in 37 Research, Inc.
16 Rock Street   Cody, WY 82414
(503)799-0915  kelly.dedel@gmail.com

*DRAFT submitted April 25, 2014*
*FINAL submitted May 8, 2014*

1.

# TABLE OF CONTENTS

History of the Case ........................................................................................................................3

Overall Compliance with the Two Remaining Provisions ............................................................4

General Recommendations ..........................................................................................................4

V.39 Quality Assurance................................................................................................................6

V.40 Corrective Action Planning .................................................................................................8

# HISTORY OF THE CASE

On May 31, 2005 the State of Mississippi (the State) entered into a Settlement Agreement with the United States Department of Justice (DOJ) concerning the conditions of confinement at the Oakley and Columbia Training Schools (Oakley and Columbia, respectively). The defendants in this case are the State of Mississippi, Department of Human Services (DHS), Division of Youth Services (DYS). A Consent Decree was issued for matters related to protecting youth from harm, suicide prevention, and medical and dental care, while a Memorandum of Agreement (MOA) was created to guide reforms in mental health and rehabilitative services and special education. Both documents included provisions for Quality Assurance.

Originally, Ms. Joyce Burrell served as the Monitor for the Consent Decree and the MOA. In late 2007, she resigned her position. In the subsequent months, the Parties assembled a new team of experts to oversee the reforms required by the Consent Decree and the MOA. This team included Mr. Len Dixon (Protection from Harm), Mr. Lindsay Hayes (Suicide Prevention), Mr. Robert Hofacre (Medical Services), Dr. Daphne Glindmeyer (Mental Health Services), and Dr. Kelly Dedel (Special Education and Quality Assurance). That team's final report (The 13th Monitors' Report), was filed with the Court on March 30, 2010.

As discussed in the 13th Report, the State achieved substantial compliance with the areas of the Consent Decree and MOA pertaining to Medical Services and Special Education. Because the State had yet to achieve substantial compliance in Protection from Harm, Suicide Prevention, Mental Health Services and Quality Assurance, the Parties returned to Court to determine the appropriate course of action. On May 28, 2010, the Parties filed a joint motion to amend the Consent Decree. The amended Consent Decree includes:
- The 19 original provisions related to Protection from Harm (two of these—related to the Columbia Training School and the Ironwood facility are now moot because both of the facilities have been closed, leaving 17 protection from harm provisions);
- One Suicide Prevention provision related to the supervision of youth at risk of self-harm;
- Three Mental Health provisions related to transition planning, notice to youth about facility rules, and accommodations in the disciplinary process for youth with disabilities; and
- Two provisions related to Quality Assurance.

Beginning with the 14th Monitor's Report, the Parties jointly selected Dr. Kelly Dedel to serve as the Monitor for all of the remaining provisions. The amended Consent Decree also required the State to submit a Corrective Action Plan (CAP), developed in collaboration with the Monitor, detailing its plans for achieving substantial compliance with the 23 remaining provisions of the Consent Decree. The CAP is a tool for the State to guide its efforts in reaching substantial compliance. The tasks and timelines are regularly monitored by the State, updated as needed, and submitted to the Monitor for review.

The 20th Monitor's Report (filed with the Court on April 11, 2013) found that the State had maintained substantial compliance with sections IV.A through IV.D (provisions related to Protection from Harm, Suicide Prevention, and Mental Health) for six months, making those provisions eligible for termination under the terms of the Consent Decree. Judge Wingate signed an order terminating these 21 provisions on September 27, 2013. Only the two provisions related to Quality Assurance (V.39 and V.40) remain, both of which were rated in Partial Compliance in the Monitor's April 2013 report.

## OVERALL COMPLIANCE WITH TWO REMAINING PROVISIONS

Since the Monitor's 20th Report was filed in April 2013, the State worked diligently to achieve substantial compliance during the summer of 2013 and to maintain that level of performance for the 6-month period required to terminate the final two provisions of the Consent Decree. Quality Assurance audits were conducted throughout the past 12-months and the written reports of the findings and Corrective Action Plans were reviewed by the Monitor and discussed with each Department Head during an on-site visit on April 17, 2014. These reports and subsequent discussions confirmed for the Monitor that the State now has a robust quality assurance process that includes procedures for corrective action planning. Together, they are capable of detecting areas in which the facility's performance is not meeting the established standards and identifying and implementing specific solutions to improve performance. Each of the two provisions is discussed in detail in the final section of this report.

## GENERAL RECOMMENDATIONS

Although the Monitor believes the State has fulfilled its obligations under the Consent Decree, the agency Director, facility administrators, and department heads were all advised to increase the level of scrutiny in a couple areas to ensure that the facility's practices keep pace with the evolving practices in the field. The key issue is the use of disciplinary isolation.

### *Disciplinary Isolation*

Recently, national standards and generally accepted practices have begun to prohibit the use of disciplinary isolation. There are several reasons for this:
- Isolation only suppresses behavior during the time the youth is in the room. It does nothing to address the underlying causes of the behavior or to decrease the likelihood that it will recur in the future.
- Youth with mental illnesses may deteriorate while isolated. Even those who do not have mental health issues often emerge from isolation feeling desperate, frustrated and angry. Approximately 50% of the suicides that occur in juvenile correctional facilities occur among youth who are in disciplinary isolation.
- Isolation disengages youth from the very programs, services and relationships that are designed to help him or her. For this reason, isolation is antithetical to the rehabilitative goal.

Mississippi currently has two forms of disciplinary isolation—Room Restriction and Due Process Isolation. When on Due Process Isolation (DPI), youth are sanctioned to a specific amount of time (usually either 48 or 72 hours) in isolation. They receive school assignments, meals and showers, but have limited interaction with any other part of Oakley's program. When on Room Restriction, youth are cycled in and out of their rooms on an hourly basis. Staff perceive this to be a prevention strategy (where youth who don't get along are on opposite cycles and thus do not have contact with each other), although it is generally imposed only after youth engage in serious misconduct. Either way, both sanctions amount to youth spending a period of time alone in their rooms, disengaged from the program, even though the tensions from the original incident have dissipated. A review of the previous 3-month's DPI records indicated that approximately 30 youth were sanctioned to at least one stint in DPI, with about half sanctioned to 48 hours and half sanctioned to 72 hours. [For context, Oakley's average daily population is approximately 60 youth.] Nearly all of these youth also had several days on

which they were cycled in and out of their rooms on Room Restriction. Although exact proportions were not calculated, periods of disciplinary isolation were imposed on approximately 10-15% of the facility population each month. Most of these youth were sanctioned to only one period of DPI, although there were two youth whose time in isolation accumulated in a potentially concerning manner. Both of these youth spent 6 days in DPI in a single month, with additional time spent in Room Restriction. Such accumulation can exacerbate the risks associated with disciplinary isolation. Fortunately, the facility's external Protection from Harm auditor highlighted this issue in her September 2013 report and clearly intends to continue to pursue the issue. The State is encouraged to fortify its Behavior Incentive System and Length of Stay policies to the point that it can safely abandon the practice in the near future. A new Length of Stay policy has been drafted that will permit days to be added and subtracted based on the youth's behavior.

| | |
|---|---|
| V.(39) <u>Quality Assurance Programs</u> The State shall develop and implement Quality Assurance programs consistent with generally accepted professional practices for each discipline addressed in this Consent Decree. ||
| Compliance Rating | Substantial Compliance |
| Discussion | DYS Policy #IX.1 "Quality Assurance Program" describes the process for conducting quality assurance audits to ensure that the programs and services at Oakley continue to meet the requirements of the Consent Decree. The overall policy is supported by policies in each major program area that describe the quality assurance efforts to be undertaken. The major components of these policies have been translated into standards that provide the foundation for audits. In some area, the standards focus nearly exclusively on the issues addressed by the Consent Decree, and moving forward, <u>the Monitor strongly recommends expanding the standards so that they cover all areas of operation</u>. For example, the Consent Decree did not cover key control by security, case management by counselors, or the total package of rehabilitative programming, but obviously these are essential components of a program's operation that need to be reviewed.<br><br>For the past year (in some areas, longer), the facility has implemented the audit schedule originally proposed by the Monitor: one comprehensive external audit (completed by a qualified external reviewer who does not work at Oakley) each year, interspersed with annual internal quality assurance audits. Taken together, the facility's practices are audited twice per year.<br><br>Either the internal or external audits may identify performance deficits or places where the facility's practices are not meeting the standard. If deficits are noted, targeted reviews should be conducted on a more frequent basis (e.g., monthly) until the problem appears to be rectified.<br><br>In early 2013, DYS hired a very well-qualified Quality Assurance Director who has ensured that the audits occur as scheduled and who compiles the findings into comprehensive reports for each discipline. She also has a major role in conducting targeted reviews for weaknesses noted in the Protection from Harm area. Her work is supported by the Department Heads in each of the major areas (Operations and Security, Mental Health, Medical, Education, and Investigations). The Department Heads direct, and sometimes conduct, the internal audits of practices in their areas and also serve as key sources of information for the external auditors.<br><br>*External Audits*<br>During the summer of 2013, each of the five subject areas (Protection from Harm, Medical, Mental Health, Education and Investigations) received comprehensive audits from an external subject matter expert who was contracted by DYS to provide on-going service. All of the subject matter experts are expected to return for the next audit cycle in Summer 2014, with the exception of the Investigations |

| | |
|---|---|
| | auditor who took another position that prohibits additional consulting. This contract is out for bid and DYS has received several letters of interest.

The Monitor reviewed each of the five audit reports and found the quality to be more than adequate. The only exception is the audit conducted on Mental Health services, which often times seemed duplicative of the Protection from Harm audit and did not take the clinical focus that is expected of an audit of the treatment services provided to youth in custody. In large part, the concern about the quality of the external audit is mitigated by the high-quality internal audits that are conducted by the Clinical Director. The internal audits delve deeply into the quality of mental health care and whether the treatment is appropriate given each youth's needs. Many of the concerns with the Mental Health audit are identical to those reported in the Monitor's 20th Report. The Monitor's concerns about the quality of the external audit were discussed at length with the Clinical Director, and several concrete strategies (including asking the external auditor to use the same audit tools employed for the internal audit) were identified. <u>If the quality of the external audit for Mental Health does not improve in the Summer 2014 audit cycle, the Monitor recommends seeking another resource who can be more responsive to the State's needs, even if this involves an allocation of resources (the current auditor provides services for free).</u>

Otherwise, the external audits contribute in significant ways to the State's ability to identify and respond to problems related to the appropriate care and treatment of youth. Not only should these audits protect the State from future litigation, but they should also provide an avenue for keeping pace with the generally accepted practices in the field given the external auditors' exposure to other systems throughout the country.

To avoid redundancy, specific areas of concern identified in both the internal and external audits are discussed in Provision V.40, Corrective Action Planning. |
| **Recommendations** | The State is in substantial compliance with this provision, and has sustained this level of performance for at least 6 months. |
| **Evidentiary Basis** | • DYS Policy #IX.1 "Quality Assurance Program" and the underlying policies for education, mental health and medical services.<br>• Internal quality assurance audits for Protection From Harm, Education, and Mental Health<br>• External quality assurance report for Protection from Harm, Medical, Mental Health, Education and Investigations<br>• Discussions with the Facility Administrator, Assistant Administrator and Director V, Quality Assurance Coordinator, Clinical Director, Director for Mental Health and Rehabilitative Services, Education Superintendent, and Medical Director |

| | |
|---|---|
| V.(40) <u>Corrective Action Plans</u> For each discipline addressed in this MOA, the State shall develop and implement policies and procedures to address problems that are uncovered during the course of quality assurance activities. The State shall develop and implement corrective action plans to address these problems in such a manner as to prevent them from occurring again in the future. | |
| Compliance Rating | Substantial Compliance |
| Discussion | In the summer of 2013, the collection of external audits identified several areas of weakness that needed to be strengthened in order to meet standards. A Corrective Action Plan (CAP) was drafted in October 2013 and included a short discussion of the nature of the problem, the objective and the action plan required to solve the problem. Specific timelines and responsible parties were identified for each issue.<br><br>Flowing from the external audits, the CAP included:<br>- Modifying the disciplinary policy to include procedures for Room Restriction, Pod Restriction and Early Bed;<br>- Updating the Student Handbook to accurately reflect the facility's disciplinary policies and practices;<br>- Improving the quality of documentation for Due Process Hearings;<br>- Ensuring that 2-hour supervisory checks of youth on Behavior Management Isolation are completed as required by policy;<br>- Assuring that grievances are fully investigated and enhancing the grievance officer's expertise with certain policies;<br>- Providing youth with additional snacks to decrease grievances about hunger;<br>- Developing a strategy to assess the effectiveness of the Behavior Incentive System;<br>- Expanding the array of training programs to include gang dynamics, intervention, etc.;<br>- Improving the quality of incident report critiques by requiring a review of videotaped footage by the Supervisor and Administrators;<br>- Refining the method for categorizing and tabulating the number of incidents each month;<br>- Conducting a problem analysis to reduce the rate of youth-on-youth violence;<br>- Reviewing the procedures and effectiveness of the BMU program's procedures for returning youth to the general population;<br>- Enhancing door security;<br>- Improving the organization of education files;<br>- Ensuring that specialized counseling notes are included in Special Education files; and<br>- Expand the classification process to ensure that factors placing youth at risk of sexual assault are explicitly considered.<br><br>By the time of the Monitor's visit in April 2014, most of the items on the CAP had been addressed. Several of the more complicated issues (e.g., those pertaining to |

|  | |
|---|---|
|  | the disciplinary system, assessing the effectiveness of the Behavior Incentive System, assessing the effectiveness of the BMU and the speed with which youth return to the general population) are still works in progress. However, the structure of the CAP, the assignment of responsibility to Department Heads who are clearly committed to improving the quality of care, and the on-going targeted reviews of these various issues combine to meet the requirements of this provision.<br><br>While the conditions of confinement at Oakley meet the requirements of the MOA, it's important to note that the MOA is based on constitutional minimum standards. Oakley's Quality Assurance program is, and should be, based on a higher standard that sets the facility on the path toward best practice. The facility and Department Heads are encouraged to accelerate work on the identified issues with the hope of addressing them all in advance of the upcoming external audits, scheduled for Summer 2014. The external auditors, Facility Administrators and Director Quality Assurance are encouraged to continue to press these issues forward to continue to continue to move the conditions of confinement at the Oakley Youth Development Center toward best practice. |
| **Recommendations** | The State is in substantial compliance with this provision, and has sustained this level of performance for at least 6 months. |
| **Evidentiary Basis** | - CAP dated October 2013 and January 2014<br>- Discussions with the Facility Administrator, Assistant Administrator and Director V, Quality Assurance Coordinator, Clinical Director, Director for Mental Health and Rehabilitative Services, Education Superintendent, and Medical Director |